The final case this morning is number 191149, Cardionet, LLC versus Infobionic, Inc. Ms. Fukuda. Good morning, Your Honor. May it please the Court. Ching-Li Fukuda on behalf of Appellant Cardionet and Framar. There is a presumption of eligibility for patents that can only be overturned by clear and convincing evidence. Here, the District Court, at a motion on the pleadings, a motion to dismiss on the pleadings, took into account no evidence to suggest that, one, the claims are directed to an abstract idea, two, that there is a lack of inventive concept when the patent itself specifically lays out the various improvements that this specific cardiac monitoring device has over the prior art. And what are those? So, one example is an improvement in the accuracy of electronic cardiac monitoring devices. What this specific device does is to look at, identify premature ventricular beats, takes that into consideration, and that has an impact on this machine being able to determine accurately whether there's the existence of atrial fibrillation or atrial flutter. That is an improvement over the prior art devices, which, you know, there was a general understanding, as the patent had set forward, that atrial fibrillation, or rather premature ventricular beats, is generally seen as being irrelevant to atrial fibrillation. But what this invention does is it says, no, you need to look at the premature ventricular beats. Well, it was common to look at the premature ventricular beats, right? There is no evidence of that, Your Honor. Well, isn't that the case? What we have to do is we have to look at what the record puts forward. But answer my question. Was it not common to look at premature ventricular beats? Maybe not in the way that the dependent claims here describe, but it was common to do that, right? Whether premature ventricular beats have been looked at in the past as some sort of arrhythmia, yes, Your Honor. But wait, just for a second. Is there any record evidence to show that? To show, for example, the district court, in its opinion, says multiple times that this is simply a technique that doctors have used for ages. Do you know of any evidence to support that? There is no such evidence whatsoever put forward in front of the district court. All we have here are infobionics attorney arguments, conclusory arguments, unsupported by evidence, that this is what doctors do. If I understand, let's talk about claim one. As I understand it, there's a claim construction issue here. The claim is not perfectly drafted. But as I understand it from footnote 13 in the district court's decision, there's an agreement that ventricular beats here means premature ventricular beats. That is correct, Your Honor. In fact, the patent itself in column nine, lines 10 to 12, says ventricular beats, i.e. premature ventricular beats. That was agreed on by the parties and adopted by the court for this case. What claim one tells us is that when it talks about beats generally, it means regular ventricular beats, right? A beat detector, yes. Then when it talks about ventricular beats, it means premature ventricular beats. Yes, Your Honor. So what claim one tells you to do is to take into account premature ventricular beats in making this comparison between the standard ventricular beats, right? What claim one tells you to do in the elements is that you have to look at the premature ventricular beats, and that has an impact on whether there is atrial fibrillation or atrial flutter. Are you also looking at the R to R? Are the premature ventricular beats, is that something that's different than looking at the successive timing of the R to R intervals? So the ventricular beats or premature ventricular beats will detect where your R peak is, right? And so if you have an arrhythmia, then you're going to have in some examples. Now, arrhythmia, there's a lot of different kinds of arrhythmias, right? That's correct. So which arrhythmia are you talking about? Because your claim is talking about two specific ones, atrial fibrillation and atrial flutter, not others, right? For this particular set of claims, yes, we're talking about those two specific arrhythmias. And is the ventricular beat, is that used so that you can determine more accurately whether it's atrial fibrillation or a flutter as compared to, say, ventricular defibrillation? I mean, or ventricular, I'm sorry, fibrillation. Yes, Your Honor. So you can look at ventricular beats or premature ventricular beats and use that for diagnosis of some other types of arrhythmia, like ventricular tachycardia, where your beats are very, very quickly in succession. But here, this invention says having premature ventricular beats gives you an indication that you are not having atrial fibrillation, right? So it puts it together in this specific context. Well, not in Claim 1, right? Yes, Your Honor, in Claim 1. How does it do that in Claim 1? So Claim 1 says, if you look at the fourth element, it has a relevance determination logic to identify a relevance of the variability in the beat-to-beat timing to at least one of atrial fibrillation and atrial flutter. And then in the next element, the fifth one, we refer back to that relevance. The fifth element says an event generator to generate an event when the variability in the beat-to-beat timing is identified as relevant to at least one of atrial fibrillation and atrial flutter in light of the variability in the beat-to-beat timing caused by ventricular beats. So that's just saying take into account the premature ventricular beats in making the comparison for the regular beats, right? It's more than that, Your Honor. You must read this claim in the context of the entire patent. What the patent teaches you is that you have to look at the premature ventricular beats, and it needs to have an impact on whether this machine determines that there is an AF episode. Do you have a dependent claim also that is more specific to this? Yes. So dependent claim two adds the additional limitation that says wherein the relevance determination logic is to accommodate variability in the beat-to-beat timing caused by the ventricular beats by weighting ventricular beats as being negatively indicative of one of atrial fibrillation or atrial flutter. So claim two further narrows how you use the premature ventricular beats and says you're actually going to weight it as negatively indicative. Do you think any of these claim limitations are written in 112-6 paragraph format even though they don't use the traditional means plus function language? So from a claim construction perspective at this point, these claims are not using the word means, and traditionally that's not interpreted to mean a means plus function limitation. But what it is bound by is it is bound by the description of the specification on what, for example, what in light of premature ventricular beats mean. Is that interpreted by the district court? It was not, Your Honor. Yeah, so maybe there's a claim construction issue here that hasn't been addressed. That is one issue here. And what the district court did, I think the more significant issue here, Your Honor, is that the district court based its finding of ineligibility on absolutely no evidence. There are factual determinations that need to be made here on what was done by doctors. What exactly did they do? Did they negatively weight this premature ventricular beats in their diagnosis of atrial fibrillation? And the other thing that the district court doesn't do is it doesn't address the fact that we're not talking about how a doctor diagnoses this. We're talking about an electronic cardiac monitoring device. So you're saying there's a presumption by the court, and it's actually in the red briefs as well, about how doctors did this before and this is simply now saying do this on a computer and your contention is that that's not the true facts? I mean, do I understand what you're saying? That's absolutely right, Your Honor. So that argument was put forward by Infobionic that this is how doctors have always done it with absolutely no evidence that doctors have done this. And then once the court accepts that, then Infobionic says all this does is do it on a computer. And even if you pass that hurdle, the problem with this set of claims is that this presents what this court has referred to as a technological solution to a technological problem or a computer solution to a computer problem. And what I mean by that is when you read these claims and you read it in the context of the patent, what it's doing is they're improving the accuracy of electronic devices. It's different from what doctors do. How many different heart conditions could there be? Does the specification include any discussion of the different possible arrhythmias that a person could have that you're detecting from when you determine if there's a fibrillation and a flutter? I believe that there's well over a dozen different arrhythmias. And one example that the specification mentions is in column 9, lines 16 to 18, where actually we'll start at line 15, where it says the occurrence of ventricular beats, premature ventricular beats, is generally unrelated to AF. For example, the occurrence of ventricular beats can be used to identify ventricular tachycardia e.g. when there are three or more consecutive ventricular beats. So that's one example of a different arrhythmia. And you would look at premature ventricular beats to identify whether there's ventricular tachycardia. My understanding, just from having litigated in this field, is that there's probably more than a dozen types of arrhythmia. Okay. Do you want to save your time for rebuttal? Yes. Thank you, Your Honor. Mr. Bell? Good morning, Your Honor. Let me tell you the problem that I have. In a lot of these 101 cases, we have a patent specification which describes to us what the prior art is and what people did before and what's new and different about this. And I read this specification, and I don't find that basic information. And the contention from opposing counsel is that there needs to be a record here to determine questions of what was well-known, what was routine and conventional, which is something that we can't tell from the patent itself. Why isn't there some merit to that? Well, I was struck by the same thing, Your Honor. In looking in column three, it lays out what it purports are the benefits, including things like increased accuracy. But what I was struck by was the same thing, that it didn't describe how that was any sort of a technological improvement over prior art systems. Typically, you look at cases like this. You don't think that the ability to more accurately identify whether someone's having a particular heart condition, you don't think that's an improvement? That's not a technological improvement in your view? Absolutely not, Your Honor, for the following reason. What this patent boils down to, and this goes to Your Honor's question as well, are basic steps of collecting data, analyzing data, and presenting data. But it's specific data, and it's for a purpose of detecting a particular condition. And let's assume for a minute that all those advantages, because I think we're supposed to in this procedural posture, we're supposed to assume that all the stated advantages that are in the patent, we have to assume that they're true, right? They're correct? We have to assume those statements are true. We don't have to assume that they're tied to the claims. And that's one of the things I would point out, is that these advantages that are put forth, the patent doesn't specify what features in the claims provide those advantages. And so you look at a case like Atrix. There, there were very detailed allegations in the complaint, which I should note here, the amended complaint, they had an opportunity to amend. They didn't add anything about 101, unlike Atrix. Also, in the specification in Atrix, there was a detailed discussion of, why is this a technological improvement? What are the features, the particular data file, how is it different from prior? What about the detection of the premature ventricular beat, and how that was not previously done before, and how that in turn has resulted in more accurate detection? Well, so a couple of responses to your honor. First, I think there is evidence in the record that doctors did rely on premature ventricular beats. I would love to see that. I would point your honor to a couple of places. One, in the patent itself, at column one, and this doesn't get us all the way there, I'll admit, but column one, lines 27 and 28. What we have there is a description of the background, and it's describing AFib and AFlut. And it recognizes there that that can have some relationship to premature ventricular beats. So there's one example. But that's not saying that there's a device that takes this into account, or that anybody previously took this into account. No, it does not. But what it does say is that this is the type of thing that doctors would look at. It doesn't say that. We know from counsel's argument that doctors can identify premature ventricular beats just by looking at an EKG. Where is that in the record? I would point your honor to A185 and A192. And at A185, and this is from a publication cited on the face of the patent, it says that doctors can visually identify from EKGs. Were we allowed to look at prior art that's cited on the patent and then analyze it in the context of a motion to dismiss on the pleadings? I think so, and there's been no contention by the other side that we can't. I mean, that was never objected to, and we've never suggested that it wasn't part of the intrinsic record, being that it's one of the patents that was examined by the agency. So I think that's conceded that we can look at that. That's a legal question though, right? I think in this context, ultimately I guess— I don't think you can concede that. I could be wrong. I'm not saying you're wrong. It occurs to me that that's a lot to look at when you're talking about motion on the pleadings. Here's where I'm ultimately going. It's not going to matter that there's no evidence here, but I want to answer Your Honor's question about where is the evidence. Where on this page do we find this evidence? So on page 185, if you look at paragraph 8, you'll see there it says, doctors can visually identify ventricular beats. So I don't think that's— We're on page—I'm sorry, appendix page 185, paragraph 8? Yes. It starts out similarly, the ventricles. Is that what you get paragraph 8 doing? That is—yes, that's that paragraph. It says PACs and PVCs and other arrhythmias can be visually identified by trained medical care. Where does this talk about atrial fibrillation or atrial flutter? So if you go up into paragraph 6, it's talking about distinguishing all these different types of arrhythmias, including AF and AFL. So from the paragraph 6, I'm supposed to infer, when it says that trained medical care can identify PACs and PVCs and then generically says other arrhythmias, I should understand that that includes all of those ever mentioned above. No, sorry, just to be clear, this is for the proposition that doctors can recognize premature ventricular beats. That's it. But it doesn't say premature ventricular beats. It says premature ventricular contractions. I believe it's referring to premature ventricular beats. Oh, that's it. That's PVC. And so then I would just turn over to page 192 of the appendix, and this is going to flesh this out a little bit more. On 192 of paragraph 74, what we have here is a description of a system that does the following. It considers the differences in the beats, particular, including— I'm sorry, which paragraph? I'm sorry, paragraph 74. Okay. So we have a system that computes the variation in the beat-to-beat variation difference, the R to R, and that's the same thing we've got here. And it takes this difference in ventricular rate variability into account to discriminate between certain other arrhythmias and atrial fibrillation. So there's an actual system that takes into account ventricular beats in determining whether there's AF. Ultimately, though, however, I want to emphasize this point, and this is crucial. What is your point? Ultimately, where I'm going with this, and I referenced it earlier, is the eligibility determination in this case doesn't depend on whether these exact claims were done in the prior article or by doctors. You said previously you were going to show us how the record shows that doctors previously could look and determine and use the premature ventricular beat to determine whether somebody was having an atrial fibrillation. I just don't see that in the text that you've provided here. So the final thing I would point to is an omission that the patentee made below at A515. And I think hopefully this will to some degree tie it all together. And I'm looking at, in particular, lines 18 through 21. And it says, when a doctor looks at a set of EKGs, they can look at the QRS complex, they can look at the ventricular beats, they know what it looks like, and they can attribute properly what associates with what. What does that mean? I mean, I understand a doctor can look at EKGs and can look at a QRS complex and they can look at ventricular beats. Right. Right? Right. But what does that tell me about whether a doctor can look at that and say, you have atrial fibrillation. You have atrial flutter. I think what it shows is that these – and this is in the context of discussing the patents and how they're supposedly different from what a doctor did. But it shows – what it emphasizes, I think – I'm sorry. That's all right. Go ahead. Go ahead. I didn't mean to – What it emphasizes – I mean, the problem I'm having is that there's an assumption that you're talking about comparing it to what a doctor did as compared to what previous devices did. So I think in both cases, and again at paragraph 74, there was a device that we submit considered the ventricular beats in deciding AF. But again – When you say considered the ventricular beats, you mean the premature ventricular beats? Yes. Yes. But ultimately what this boils down to is the mental processes. So when we talk about what a doctor could do – Okay, but why – wouldn't it be better to do this on a more complete record? I mean, you say this was taken into account by doctors. If that's not true, if the patentee here came up with the idea of considering premature ventricular beats and making this determination of the variability, the regular beats, maybe that would be a patent-eligible invention. But sitting here, we really don't know whether the thing that they're claiming, for example, in claim one or even in the other claims, was something that was well-known or not well-known. You're asking us to make a determination that something was well-known based on some scattered references in these other patents. I take it that your position is that it was well-known. We think it was, but the more important point is that it doesn't matter. For example, in the SAP case, there you had a situation where someone – I'm not sure that I understand why it wouldn't matter. If this were the first time that someone had said, well, in making this variability comparison about, let's say, the regular ventricular beats, the first time that somebody had discovered that you should also take account of the premature ventricular beats and factor that in, if that was something new, maybe this would be different. So what this court said in SAP, and this will answer your question, if what you are purporting is the advance, the technological advance, is in fact an abstract concept, it doesn't matter whether it's brilliant, innovative, you know, completely new. That's what this court said in SAP, and it was echoing the Supreme Court in Myriad. And what that shows is the three things they've identified as the purported advances. One, take some physiological data, reach some conclusions about that physiological data, which is the kind of mental thing that doctors have always done. One of the problems is that you have a difficult situation where the patent mentions all sorts of advantages, and those should have been taken into account by the district court. If you're saying it doesn't matter that the invention's novel at all, but you're saying it's not a technological improvement when the patent itself says that it more accurately diagnoses whether a person has a particular condition, namely atrial fibrillation or atrial flutter. So why doesn't that make it concrete and not abstract? So the patents in the following cases all said they had technological advances, SAP, fair warning, electric power, and a host of others. But this court said that those weren't technological advantages. Exactly, and it did so on the pleading or as a matter of law. So in fair warning, for example, it was looking at health records, There's no question that you can do it as a matter of law when the patent itself gives you the information that is necessary to make that determination. But I guess the problem is here that I don't see this patent as telling us that it was well known to take into account the premature ventricular beats. It may have been. You may be right about that. If you are, then this may well be abstract. But without the data, you're asking us, it seems to me, to speculate a little bit. So I would say let's assume that it is completely new. We think it's not, but let's assume it's completely new. Then we're squarely in the realm of fluke and SAP and all of those cases where the patent team made the same argument. There's no evidence that this was done before. There's no evidence that a machine did this before. Mr. Bell, let me take you on a slightly with my colleagues. Do you have a question? I just wanted to, if you don't mind, I just wanted one question about, I was looking at one of the references that you cited to earlier. You cited us to a particular patent that you thought was helpful in determining whether doctors had done this before. I just wanted to ask you about paragraph 10 on page appendix 185. Sure. There it says, these episodes of AF and AFI are difficult and not impossible to be induced and observed by a physician in tests conducted in a clinic. Doesn't that undermine the position that you're taking? No, for this reason, Your Honor. That's the argument that my colleague has made. What it says is it's difficult to induce and observe it in a test environment. In other words, you're not going to Sure. I mean, I know these are intermittent problems that people have. Exactly. They're not pervasive. Exactly. Well, that's all the more reason why it's difficult for a doctor to just observe it, right? No, not at all. Not at all. What it's saying is you wouldn't purposely give somebody an affibrillation or something like that. It's difficult to induce and observe. I can understand what you're saying, but it could also be saying it's both difficult to induce and to observe. Okay, I would say I mean, given this, that there's a presumption of validity and that we're in the procedural stage that we're in where we're supposed to make all inferences in favor of the patent owner, it's difficult to understand your reading. So I would say in the context of paragraphs 6, it's talking about what a doctor could easily deduce from the ventricular beats and observe it in an EKG. And that, I think, is reflected in the patent itself. It has an EKG right there. Well, there's no question but that premature ventricular beats are shown by an EKG, right? Right. There's no question about that. And if you look at the claim language, it's exceptionally broad. It has determination logic. If I could just focus the court's attention on that. Determine whether something is relevant, some physiological data is relevant to some other condition. That's a mental process. That's what a doctor does. Even if no doctor had ever done it, this court and I would put this claim right up against electric power where it was all about collecting data about electrical signals from an entire network, power network, churning it in some way, applying certain metrics to it that were purportedly brand new. Brand new metrics like an SAP. And then finally presenting that data. It doesn't ultimately matter whether that was ever done before. That's what this court has said. Sorry for taking your time. Is it fair to say that the question before us is whether the 207 patent is directed to an abstract idea and the asserted claims do not add inventive elements? Absolutely. Yes, Your Honor. So your suggestion is that what Alice directs us to is the patent. Yes. But that's not right. If you read Alice, and nobody bothers to read Alice anymore, Alice says directed to the claims. It doesn't say anything about patents. I just suggest that to you. You might read Alice again just to be sure I'm right. Hypothetically, if I'm right, let's look at Claim 1. Can you look at Claim 1 with me? Do you have a copy of it handy? Absolutely. Yes, Your Honor. Would you read the opening to Claim 1 for me? A device comprising... Stop right there. Would it be fair to say that Claim 1 is directed to a device? Yes. At least recites a device. Directed to a device. I just want to be careful there because directed to is a term of art, what the ultimate underlying invention is. There's a lot of question about what directed to means. Exactly. Let's take it on its face. Is Claim 1 directed to a device? It definitely recites a device. So it would be something we could pick up in our hands. Perhaps. Perhaps not. If they ever made it, it would be a thing. And it's a device comprising a beat detector, some kind of a detector. A ventricle beat detector, again some kind of a detector. An event generator. All of these are some kind of mechanical equipment, aren't they? Not necessarily. The specification says it could be hardware or software. These could be completely soft components. A device is a soft component? A computer could be a device. And it could run all of these things. But a device. A device. It could be a computer. A device is not an idea, is it? Oh, well, Alice had apparatuses as well, Your Honor. Alice had claims, and at the end of that opinion, it looked at the apparatus claims and said, we don't put any stock in the fact that it's a physical computer. That's what Alice said. A physical computer. That was the problem in Alice. Physical apparatus. They had a big discussion about whether computers had ideas or whether computers were an idea. Let's move away from that. Just help me with one thing. If we look at only the claim, help me figure out what it's directed to. Looking at just the claim, not the patent. Sure. Absolutely. So if Your Honor looks at, and I appreciate the question, and the beat detector and the ventricular beat detector, just for clarity, the patent itself in column nine says that those are conventional, off-the-shelf software pieces. Nobody disputes that. The Mortara system described them. Okay, so that's software. Okay, that's fine. Now let's move on to what... Software is a thing. It can be embodied in a device, no question. Okay. So let's go on then to the determination logic. What it determines is the variability in those beats. I don't think there's any... Well, let me stop you right there. Yes, Your Honor. This patent doesn't make any sense, and this claim, you've got me doing it. This claim doesn't make any sense to me. I can't figure out what all those words mean in some of those lines. But that's not our job. At this point, that's a job, section 102, 103, and 112. We're not doing that. We're doing 101. So the question is, under 101, is this an idea or is this a thing? The underlying invention purported here is an idea in the same way it was in Alice. Alice had some very similar type of devices or components listed. Numerous cases in this court have used words that kind of sound maybe a little technical. But when you drill down and look at the claim, and thank you for the question, the claim says the variability determination determines variability. That's functional. That's one of the elements. That's one of the elements. One of the limitations, more accurately. Limitations. One of the limitations. But it has other limitations which sound awfully non-idea-like. They sound awfully thing-like. Do we ignore that? You look at what they purport, the patentee purports to be the advance. And here's all they purport is the advance. Determine AF taking into account ventricular beats. That's it. And that's reflected in the claim when it says to determine the relevance. Right? It doesn't give you any details there, but in deciding whether you have AF in that final step, all it says is in light of the variability in the beats and the ventricular beats. What's wrong with that? That's just a mental process. The fact that you put it in a box or call it a device, Alice said you can't just do that. That's not enough. This court has said it in semantic and three dozen cases since Alice that just putting it in some physical form is not enough. And that's why this lines up, I would say, squarely with electric power, squarely with fair warning and SAP. Do you think these claims are written in one, 12, six paragraph format? I think they very well, they certainly smack of that. So I think if they're definite at all, Well, setting definiteness aside, I want you to know you're familiar with our case on means plus function. There's a presumption if means isn't in the claim that it's not means plus function format, but that's a presumption that can be overcome  I'm just curious as to your view on whether these claims are written in one, 12, six. They certainly sound like the thing that Williamson said. Did you think about this at all? I think we have been developing that position. Absolutely. But here's the key point on that. And my friend on the other side mentioned claim construction. They were given the opportunity at least eight times to say, what is it about these claims that you would incorporate, if anything, from the specification? And then they uniformly said nothing. In A528 to 529, they specifically said that the logic is not bound by anything except what's in the words of the claim itself. I think what their position was, right, was that once your claim construction positions are developed, and then the court actually construes the claims, then they thought maybe there'd be a different 101 case in front of the court. And I can understand why they would think that, but this court in the my mail decision said district courts have two options. One, take what the patentee says is the claim construction and run with it and decide 101 because they're in the best position to determine what's advantageous for them at that stage. Or, do the full-blown markman. Right, and so that's why we see numerous cases where you accept the patentee's construction. That's why the district court almost begged the patentee, tell me what you think it means. And we've set this out towards the end of our brief. Tell me what you think it means. And uniformly, the patentee refused to limit it. And that's why we have these very functional claims in claim one and all the rest. For example, are you saying that if you claim 10 as a means plus function claim that you need to look to the spec to see the structure that performs the nonlinear function, which I guess is figure seven? I think that would be one possibility, although it's not clear that there's much of a structure at all for the nonlinear, other than the patentee says any nonlinear function, which is simply it's not a straight line. That's math. That's SAP. If you look at the flute case, there were very detailed equations, mathematical equations at the appendix of that Supreme Court decision. And the Supreme Court said, let's assume that's novel. Let's assume that improves the field of petrochemical analysis. The Supreme Court said, it still doesn't pass 101 because somebody can do it mentally. Not that they have, but that they can. But there's also other cases like Dierk. There's cases like McGrow. There's other cases where math is involved, right? Where just because math is involved or there's an algorithm doesn't mean that it's ineligible, right? Correct. But when that is the thing that they are purporting somehow distinguishes it and makes it innovative, that's when you run into a problem. That's when you run into a problem like in SAP or Cognacorp and the other cases. I think that's a useful comparison. Explain that to me. I don't understand that. Sure. In SAP, there was an existing financial analysis system on the web. It was a web-based system. The patentee came along and said, the way you're doing that is not right. Here's a better way to do it. This is going to improve the analysis of financial market prediction. They said, here's the claim to put that in. This court said, we don't care if it's brilliant, innovative. What about the cases I was talking about, like McGrow? Sure. McGrow, for example, is a case where different rules and algorithms were used to create animation, right? Yes. On a computer. Yes. As distinguished from prior ways that humans would do it, for example. There, those claims were found eligible. How do you distinguish a case like McGrow, especially on this record where there's no evidence that doctors could even use the technique in these claims to determine whether someone has this particular condition? Here's what the McGrow court said was really important. It was the specificity of the rules that really got it over the hurdle there. And just to give you some of the flavor of that, this court said there were limited rules with a specific format, including a MorphWeightSetStreamSet as a function of phoneme sequences and times and transition parameters and many other things. The point there was there was a clear technological process of lip-sync animation. That was technological. Here, we're in the medical world. And so when you hold this up against all the cases that found some sort of computer or technological advancement, I think you'll see a stark comparison. Counsel, I don't fault you for taking advantage of our precedents. I don't even want to get into that. Yes, Your Honor. But doesn't this discussion suggest to you that rather than decide these cases based on attorney argument, wouldn't we be better off if we didn't accept a 12B6 termination of a question of the validity of a patent and at least require some sort of record to come up with it? Well, I think... This was a 12B6 dismissal. Yes, it was, Your Honor. No record. Yes, it was. Nothing. Well... We know nothing about whether this thing works or doesn't work. At least I don't because I'm not a medical scientist. Maybe you are. And the patent itself doesn't give us a lot of guidance about what was done previously and what was well known. So I think... And I apologize if I cut you off. No, that's... If we look at... That's the point. That is not the point. I think... The trial judge was working in the dark and you lawyers come up here and blow smoke and try to keep us in the dark as well. I thought the judicial process was designed to give information and to open things up, but we can't do that on a 12B6. Well, I would respectfully disagree in this case, Your Honor, because the district court did try to shed light on it. It gave the patentee every opportunity to say what is the factual dispute here and what claim construction are you saying that will get you over the hurdle? And I don't think it's unreasonable to put the patentee to that burden in the same way that the patentee has to well plead the complaint and the specification has to give you the technological advance and so on and so forth. So I don't... Whether this court decides to change the law or the Supreme Court decides to change it, we'll certainly follow it in any event. As I say, I don't fault you for doing what you do. But... And just to be clear, the 12B6 and 12C dismissals are rampant throughout this court's case law and I think the ones most on point are SAP, fair warning, electric power was someone's judgment but it was a matter of law, compared to cases like SRI where there was an improved network or FinGen where there was an improved virus protection or Amdocs where there's an improved way of enhancing a data file in a distributed architecture. In column 11 here... Okay, I think we're about out of time. Thank you, Your Honor. All right. Thank you, Mr. Gale. Ms. Fukuda? You have two minutes here. Thank you. So, Judge Plager, I'd like to address... Two minutes. ...you identifying the device. This is absolutely claims directed to a thing. And this thing here is a cardiac monitoring device. A special purpose... This is not a general purpose computer. This is a special... In fact, CardioNet, Infobionic, we both make those types of devices. You wear them, they get bigger... But the device part of this that's described in here was well known and the patent itself makes clear that the device part of this existed before, right? This device is not known. In fact, the invention is about... But the monitor for measuring the ventricle beats, that sort of hardware was known, right? Certain components of it was known. Yeah, but it's the use to which it was put that is claimed to be new. It is not just the use, Your Honor. This is a device that uses certain components that were known, but when you program it with the algorithm that's claimed in these claims, it becomes a not well known device. And it's a cardiac monitor. It's sort of like the GPS monitors, right? Those are not generic computers. In fact, if you look at dependent claim 10, it adds... Oh, I'm sorry. I meant dependent claim 12, which is also at issue here. It talks about this device further comprising a sensor that includes two or more body surface electrodes subject to one or more potential differences related to cardiac activity. This is a cardiac monitor. This is not a generic computer. So once you put this innovative algorithm into this device, not only do you have... It's the algorithm, right? It's the algorithm implemented in this specific device. This is like the diamond versus deer situation. Even if you have a mathematical algorithm that's well known, if you use it in a specific context, limited in here, we are very limited. This does not present any of the preemption concerns. If it's well known, it would be obvious at some point, wouldn't it? Certainly, defendants can prove that if this case progresses. Who gets a chance to prove that? Sure. But that is a different analysis. And in fact, precedent says that even if you identify one piece of prior art, which they tried to do here, and we haven't looked at that in detail, that's not enough to establish that it's well known, routine, or conventional for purposes of 101. So we're nowhere near to a showing of ineligibility, much less by clear and convincing evidence. Okay. Thank you. Case is submitted. Thank both counsel. That concludes our session for this morning. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.